**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-00050 (CJN)** |
| **v.** | : | |
| | : | |
| **ADAM AVERY HONEYCUTT,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Adam Avery Honeycutt ("Honeycutt") to 90 days' incarceration, to be served consecutively to Honeycutt's current term of incarceration on unrelated charges, 36 months' probation, 60 hours of community service, and $500 restitution.

I.      **Introduction**

The defendant, Adam Avery Honeycutt, a former bail bondsman residing in Orange Park, Florida, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[1]

On March 1, 2022, Honeycutt pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

herein, a sentence of ninety days' imprisonment is appropriate in this case because Honeycutt: (1) made his way to the Lower West Terrace of the Capitol, where some of the worst violence committed by rioters against the police occurred; (2) climbed through a broken window to enter the Capitol Building; (3) entered a sensitive space, a conference room used by Members of Congress, which was not open to the public even on days when the Capitol was open to the public; (4) filmed, handled, and posted videos of property destruction within; (5) posted images to social media of confrontations between rioters and police and property destruction committed by other rioters, then mocked the vastly outnumbered police officers who were trying to defend the Capitol on the West Terrace for "hiding" from the mob; (6) helped to pass a long wooden plank to other rioters who were violently battling police in the Lower West Terrace Tunnel after he had exited the Capitol Building; (7) initially posted images of his participation on social media but deleted them several days later and gave a false explanation of his conduct on Facebook that minimized his involvement in the riot; (8) had a heightened responsibility to respect the law as a bail bondsman, which he failed to do; and (9) received an 18 month sentence of incarceration because of firearms and drug paraphernalia found in his residence during the execution of a search warrant for this case, but has not yet been held accountable for his actions on January 6.

The Court must also consider that Honeycutt's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to substantially delay the certification vote. Honeycutt's unlawful participation in a riot that succeeded in disrupting the Congressional certification combined with his apparent celebration of the property destruction on

that day, his assisting other rioters who were fighting with the police, and his lack of remorse warrant a substantial jail sentence.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 32 (Statement of Offense), at 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day.

### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.  Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117  Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at  https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT").  The entrance usually consists of a flight of stairs leading to a doorway.  On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long.  That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building.  The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building.  This archway is also of great symbolic significance as it has been

the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the

entrance for the President-Elect and other dignitaries on Inauguration Day.

"Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of

doors was closed and locked, and members of Congress who had fled from the rioters were

sheltering nearby.  Members of the United States Capitol Police ("USCP"), assisted by officers

from the District of Columbia Metropolitan Police Department (MPD), were arrayed inside the

doorway and guarding the entrance.  Many of these officers had already physically engaged with

the mob for over an hour, having reestablished a defense line there after retreating from an earlier

protracted skirmish on the West Plaza below.

At approximately 2:42 p.m. the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement officers with batons, poles, chemical spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray. At a later hearing on the events of January 6, Congressman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight." Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police, including the isolation and tasering of MPD Officer Michael Fanone and the previously-mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force.

Many of the makeshift weapons and projectiles used to attack the police were taken by rioters from the interior and exterior of the Capitol Building.  These items included wooden planks, pieces of scaffolding, and broken furniture, including wooden table legs, taken from rooms inside the Capitol Building.

Directly to the left and right of the Tunnel are windows leading into conference rooms used by congressional staffers.  These conference rooms are sensitive areas that are not open to the public.  One such conference room, Senate Mezzanine Conference Room 2 ("SMCR-2"), is located immediately to the left of the Tunnel.  During the battle on the LWT, rioters broke the windows of SMCR-2 and entered the room.  Once inside, they proceeded to break furniture and pass it outside for use as weapons by other rioters on the front line of the battle with the police.

With this backdrop, we turn to the behavior and conduct of Honeycutt on January 6, 2021.

*Honeycutt's Role in the January 6, 2021 Attack on the Capitol*

Several weeks before January 6, Honeycutt began posting to social media about going to Washington D.C. for the "Stop the Steal" rally.  On December 25, 2020, Honeycutt shared a video on Facebook entitled "Trump: Supporters Should join 'Wild' Protest in DC on Jan. 6." Accompanying the video, Honeycutt posted the text: "Who's coming with me?"



On January 6, 2021, Honeycutt flew from Florida to Washington D.C.  Honeycutt's Facebook account displayed an image that day of a map showing a line of travel from Jacksonville International Airport to Washington D.C.



Honeycutt posted a photo of himself that morning, standing on the National Mall with the U.S. Capitol Building in the background.  He briefly used this photograph as his public profile picture on Facebook until he changed it several days later.  In the photo, he was wearing a black hooded jacket, a dark knit hat, and a black backpack.  Honeycutt was also wearing black leather gloves, which can be seen in other images from that day.



 Honeycutt posted multiple videos to Facebook documenting his presence at the U.S. Capitol on January 6, 2021.  Some of these videos were publicly accessible on Honeycutt's Facebook page during and after January 6.  He filmed multiple videos from the UWT outside the U.S. Capitol building.  Those videos show the external terraces of the Capitol Building overrun by rioters.

In one video (Exhibit 1), posted to Honeycutt's Facebook page, Honeycutt is behind other rioters who are moving toward an entrance to the Capitol.  They appear to be on the South side of the LWT shortly after the police fell back after losing the line on the Upper West Plaza to successive assaults by rioters.  One of the other rioters can be heard saying "let's go inside," "let's

go say hello to our senators and congressmen," "let's go tell them who won this election," and "let's go take our building."  Honeycutt can be heard saying, "that looks like tear gas."



**Exhibit 1**

In another video (Exhibit 2), posted to Facebook by Honeycutt, Honeycutt filmed numerous rioters on the inauguration bleachers above the LWT.  Some of the rioters were yelling aggressively at police.  One rioter can be heard yelling, "Is this what you signed up for, you communist cowards?"  A cloud of red smoke can be seen.  Honeycutt says, "I can taste the pepper spray."



**Exhibit 2**



**Exhibit 2**

In a third video (Exhibit 3), which Honeycutt posted to Facebook, Honeycutt is near the top of the inauguration bleachers above the LWT.  A group of police officers can be seen in front of the House Wing of the Capitol Building.  Honeycutt says, "That's where all the cops are hiding!"  Other police appear to block rioters from accessing the Upper West Terrace.  The rioters appear to argue and gesture aggressively toward the police officers.   Honeycutt says, "It's about to go down!"



**Exhibit 3**

Honeycutt entered the Capitol Building, most likely by climbing through a broken window into SMCR-2.  The government has been unable to determine how long Honeycutt was inside the Capitol Building, but it appears to have been less than an hour.  Honeycutt exited from a broken window back to the LWT at approximately 4:30 p.m. The government has been unable to determine whether Honeycutt went to other locations within the Capitol Building or if he, like many other rioters who entered through that window, stayed in SMCR-2.

SMCR-2 is one of a suite of conference rooms available for members of Congress and their staffs.  It is considered a sensitive location that is not open to the public.  While inside SMCR-2, Honeycutt recorded a video of himself (Exhibit 4), showing a noisy and chaotic scene with rioters milling about, debris on the floor and an overturned conference room table.



**Exhibit 4**

Honeycutt appeared in the video, laughing and smiling.  In the video, Honeycutt stated:

"Well, made it in."  Then Honeycutt looked at the camera, grinning, and stuck out his tongue.



**Exhibit 4**



**Exhibit 4**

In addition to the video, Honeycutt posted several still photographs to his Facebook page showing property damage inside the Capitol Building.  One photograph shows a gloved hand, likely Honeycutt's, holding a broken furniture leg.  In a second larger picture, the furniture leg is turned toward the camera to expose a coded property sticker showing that it was property of the United States Senate.



Video images of Honeycutt from earlier in the day show him wearing black gloves and a black jacket that match those worn by the hand holding the table leg in the video that he took.



During the time that Honeycutt was inside the Capitol Building, rioters passed wooden furniture, like the table leg Honeycutt photographed, out the window from SMCR-2. This furniture was broken into pieces and used as weapons against the police who were defending the Tunnel, which is located adjacent to the window of SMCR-2.





Other rioters can be seen using these pieces of furniture to fight against the police.  The screenshots below show a desk drawer being thrown at the police and a table leg being wielded like a club.





Honeycutt exited the Capitol Building around 4:30 p.m. from a broken window in SMCR-2 that led to the LWT. His exit from the window was captured on video (Exhibit 5). When Honeycutt exited the building, the LWT was overrun by rioters, many of whom continued to battle the police just steps away from him at the entrance to the Tunnel.

While Honeycutt climbed out of the window, another rioter repeatedly smashed an adjacent window with a baseball bat. The crowd can be heard chanting hostile slogans at the police, including "Traitor! Traitor!"



**Exhibit 5**



**Exhibit 5**

The Lower West Terrace Tunnel was located approximately ten feet from the window Honeycutt emerged from. At that time, rioters were engaged in a brutal melee with the police in

the Tunnel, using makeshift projectiles and clubs.   Honeycutt assisted those other rioters by joining in passing a long wooden beam toward the Tunnel, which could be used as a weapon against the police.  This was captured on video (Exhibit 6).



**Exhibit 6**



**Exhibit 6**



**Exhibit 6**

Honeycutt can be seen holding the beam with both hands for approximately five seconds, while passing it toward other rioters at the Tunnel.



The government has been unable to determine how the beam was used once it reached the Tunnel.  There are numerous images of similar objects being thrown at the police and used as clubs to strike the police.

Honeycutt returned to Florida on January 7, 2021.

On January 7, 2021, the FBI National Threat Operations Center (NTOC) received a report concerning Honeycutt.  The complainant had viewed information on Honeycutt's Facebook account, including some of the photos and videos referenced  above, and concluded that Honeycutt had broken into the U.S. Capitol on January 6, 2021.

On January 8, 2021, the FBI received a tip by email that stated, *inter alia*, "Adam Honeycutt is a bondsman and has offices in Charlotte County FL and Gainesville.  He traveled to attend this protest and posted videos and fb lives inside the capital during the riots. They have since been deleted and claiming to have attended after the damage was done.  That is false."

On January 10, 2021, Honeycutt posted to Facebook a message attempting to minimize his involvement in the riot.  In the message, he falsely claimed that he "wasn't with the rioters" and that he was actually "at the food truck when the shit hit the fan."



*Arrest of Honeycutt and Search of his Residence*

On January 13, 2021, an FBI agent contacted Honeycutt by telephone.  Honeycutt said he was willing to cooperate fully in the investigation.  On January 16, 2021, another agent contacted Honeycutt by phone.  Honeycutt agreed to meet with the agent for an interview but prior to the agreed upon time, an attorney representing Honeycutt contacted the agent.  On January 19, 2021, the attorney informed the FBI that Honeycutt was not interested in participating in a voluntary interview and if Honeycutt was to be charged, the lawyer would arrange for Honeycutt to surrender.

On February 11, 2021, agents arrested Honeycutt at his Florida residence pursuant to a criminal complaint and arrest warrant issued by this Court. They also searched the residence pursuant to a federal search warrant.  They found and seized multiple firearms, over ten thousand rounds of ammunition, three glass marijuana pipes, and other drug paraphernalia.  Trace amounts of marijuana residue were found on the drug paraphernalia, but no other marijuana was found.

24

Five of the seized firearms were in a towel closet, one was in a gun case in a clothes basket, and one was located on a bed.  Two of the firearms were loaded, a .22 caliber Jennings pistol and a Glock 21, which were both found on a shelf in the closet.

Because Honeycutt had previously declined to be interviewed through his lawyer, the officers did not *Mirandize* or question Honeycutt.  Nonetheless, Honeycutt made several spontaneous statements while he was being transported.  He admitted that all the guns and drugs belonged to him.  He shared the residence with his three children (ages 9, 8 and 2), their mother, and Honeycutt's father.

Honeycutt told the arresting agents he knew the firearms and drug paraphernalia looked bad and apologized for having firearms in the open inside the residence.  Honeycutt claimed to be in the process of moving all the guns and ammunition to a storage unit.

Honeycutt told the agents his marijuana supply was depleted and if they had waited until the next day, he would have had a lot more.  Honeycutt stated that he had been smoking marijuana since he was 12 years of age and he continued to smoke almost daily.  Honeycutt stated he was upset because he ran out of marijuana and would not have any waiting for him when he got home from court.

*Federal Prosecution of Honeycutt in the Middle District of Florida for Firearms Offense*

On February 11, 2021, Honeycutt had his initial appearance in the United States District Court for the Middle District of Florida on the complaint in this case and was detained pending trial.  On February 18, 2021, a grand jury in the Middle District of Florida returned an indictment charging Honeycutt with possession of firearms by an unlawful user of a controlled substance in violation of 18 U.S.C. § 922(g)(2) and §924(a)(2).  *See United States v. Adam Honeycutt*, 21-cr-00013-HES-JBT (M.D. Fla.).  On February 24, Honeycutt was arraigned on the firearms charge

and ordered detained pending trial.  He made his initial appearance on the instant case in this Court on October 5, 2021, at which time he was held without bond.  On March 17, 2021, Honeycutt was ordered released in this case but remained detained in Florida on the firearms charge.

On June 1, 2021, Honeycutt pleaded guilty to the firearms charge.  On October 13, 2021, the Florida court sentenced Honeycutt to 18 months' imprisonment and 12 months of supervised release, to include mandatory drug testing and participation in a substance abuse program.  The Bureau of Prisons (BOP) has credited all of Honeycutt's time in custody, beginning with his arrest on February 11, 2021, towards the 18-month sentence from the Florida gun case.  This includes the time Honeycutt was detained on the D.D.C. charges prior to his indictment on the firearms charge.  The BOP estimated that Honeycutt is due to be released on May 23, 2022.

*The Charges and Plea Agreement in this Case*

On February 10, 2021, the United States Attorney's Office for the District of Columbia charged Honeycutt by criminal complaint with Knowingly Entering or Remaining in any Restricted Building or Grounds without Lawful Authority, in violation of 18 U.S.C. § 1752(a)(1), and Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2).

On February 11, 2022, Honeycutt was charged by a one-count information with violating 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building).  On March 1, 2022, Honeycutt pleaded guilty to the one-count information.  In his plea agreement, Honeycutt agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Honeycutt now faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Honeycutt faces up to six months

of imprisonment and a fine of up to $5,000.  Honeycutt must also pay restitution under the terms

of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072,

1078-79 (D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines

do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies

the factors a court must consider in formulating the sentence.  Some of those factors include: the

nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence,

§ 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with

similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as

described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a criminal offense unparalleled in

American history.  It represented a grave threat to our democratic norms; indeed, it was the one of

the only times in our history when the Capitol Building was literally occupied by hostile

participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court

should note that each person who entered the Capitol on January 6 without authorization did so

under the most extreme of circumstances.   As they entered the Capitol, they would—at a

minimum—have crossed through numerous barriers and barricades and heard the throes of a mob.

Depending on the timing and location of their approach, they also may have observed extensive

fighting with police officers and smelled chemical irritants in the air.  In the videos he took that day, Honeycutt specifically mentions tasting pepper spray and seeing tear gas.

Additionally, while looking at Honeycutt's individual conduct, this Court, in determining a fair and just sentence, should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from police; and (9) whether the defendant demonstrated  sincere remorse or contrition.  While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Honeycutt personally engaged in violence or destruction, he would be facing additional charges and penalties associated with that conduct.  The absence of violent or destructive acts on Honeycutt's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Honeycutt from most other misdemeanor defendants.

Honeycutt is believed to have entered the U.S. Capitol Building through a broken window on the Lower West Terrace.  At the time, there was a large unruly mob present on the LWT.  Some members of this mob had battled the police on the Upper West Plaza.  Hand to hand fighting between rioters and the police continued to occur in and around the LWT Tunnel, an area located near the window through which Honeycutt most likely entered.

While there is no recording of Honeycutt directly encouraging violence, Honeycutt made several statements that express agreement with the violent attacks against the police and even

gleefulness at such attacks.  In one of the videos he posted on Facebook, which was filmed in the LWT area near where rioters were violently battling police, Honeycutt stated excitedly, "that's where the police are hiding out" and "it's about to go down!"  As these statements were made aloud in crowded areas, they likely contributed to the general lawlessness and/or emboldened others to act violently toward the police.

Honeycutt's reaction to acts of violence and destruction could only be described as celebratory.  SMCR-2 was a sensitive area of the Capitol Building that was used by Senate staffers for their official duties.  That room was not open to the public even on days when the Capitol Building as a whole was open to the public.  While Honeycutt was in that room, it was littered with overturned and broken furniture.  In the video he recorded and posted to Facebook, Honeycutt grinned and exclaimed "Made it in!"  As the video panned around the room, an overturned wooden table, a lamp, and other furniture can be seen strewn across the floor.  In the video Honeycutt smiles and sticks out his tongue as if the scene is one big joke.

While there is no evidence Honeycutt personally destroyed property or passed it to other rioters while he was inside SMCR-2, Honeycutt handled such destroyed property and celebrated the destruction by posting photographs of broken furniture on Facebook.  Honeycutt posted a picture of a gloved hand holding a broken wooden furniture leg.  The broken furniture leg had a sticker that read "Senate Sergeant at Arms."  Such a broken table leg was exactly the kind of item used by other rioters as makeshift weapons against the police.

After he exited the Capitol Building by climbing out the window, Honeycutt walked into the crowd of rioters on the LWT, some of whom were violently battling the police in the Tunnel. Rather than peacefully leave, Honeycutt then assisted other rioters who were passing a large wooden beam toward the Tunnel door, likely for use as a weapon against the police.  Honeycutt

used both hands to handle the wooden beam for approximately five seconds, passing it toward other rioters at the Tunnel.

As described above, some of the most violent clashes of January 6 took place at the Tunnel. At the time that Honeycutt assisted in passing the beam, rioters were physically engaged with law enforcement officers using batons, poles, chemical spray, furniture, and other items.  Rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers in a concerted effort to breach the doorway to the basement area of the Capitol.

While it is not clear what the beam was used for by the rioters at the Tunnel, similar objects were used as projectiles and clubs during the assault against the police.

While initially appearing proud of his participation in the attack on the Capitol, Honeycutt later attempted to minimize and conceal what he had done.  Several days after January 6, Honeycutt changed his Facebook profile picture from a picture of himself in front of the Capitol Building to a picture of himself with a small child.  Additionally, Honeycutt posted a message that sought to falsely minimize his participation in the riot.  On January 10, 2021, Honeycutt posted to Facebook a message alleging that he "was not part of the violence," "wasn't with the rioters," and "was at the food truck when the shit hit the fan."  Based on his own video recordings, that was demonstratively false.

 The Government is aware of no evidence that Honeycutt has demonstrated sincere remorse or contrition.  When first approached by the FBI, Honeycutt agreed to participate in a voluntary interview.  However, he subsequently retracted this agreement.

**B.  Honeycutt's History and Characteristics**

As set forth in the PSR, Honeycutt's criminal history includes convictions for Possession of a Firearm by an Unlawful User of a Controlled Substance (2021), Disorderly Conduct (2011),

and Driving While License Suspended or Revoked (2002).  The PSR also notes arrests for Possession of Marijuana (2003), resulting in a Court Intervention Program, and Domestic Battery (2006), which was dismissed.  The PSR noted that the complainant in the Domestic Battery case did not wish to press charges.

The PSR details two civil protection orders against Honeycutt.  On June 25, 2009, an individual identified by Honeycutt as his girlfriend and mother of three of his children, filed a Petition for Injunction for Protection Against Domestic Violence in Charlotte County, Florida. According to the PSR, the petition alleged that Honeycutt committed multiple acts of violence toward her and her unborn child.  On June 25, 2009, the Court filed a Temporary Injunction for Protection Against Domestic Violence against Honeycutt, which was subsequently dismissed on July 22, 2009.

On June 13, 2011, the owner of a rental agency filed a Petition against Honeycutt for Protection Against Repeat Violence.  The petition alleged that Honeycutt made repeated threats toward her.  On June 28, 2011, the court issued a Final Judgment of Injunction for Protection Against Repeat Violence, which remained in effect until June 28, 2012.

Additionally, the PSR detailed multiple federal tax liens against Honeycutt.  According to the PSR, between 2011 and 2016, the Internal Revenue Service filed four federal tax liens against Honeycutt in the amounts of $132,669, $48,398, $4,046 and $43,513.

Honeycutt reported to the PSR writer that he owned a bail bonds company called "Bundy's Bail Bonds" in Punta Gorda, Florida, from 2008 until his arrest.  Honeycutt stated that he earned approximately three to four hundred thousand dollars per year and reported that he owed $7,000 in back taxes for his business.

While Honeycutt's work as a business owner is laudable, his professional familiarity the criminal justice system renders his conduct on January 6 all the more troubling.   As a bail bondsman, Honeycutt was aware of the consequences of breaking the criminal law and had a heightened responsibility to comply with it.   Under Florida law, a person may not own or have control of a bail bond agency if they have been convicted or pleaded guilty to a felony crime or a crime of moral turpitude.   *See* § 350.34, Fla. Stat. (2021).

As described above, at the time of his arrest, Honeycutt told officers he had been smoking marijuana since he was 12 years of age, and that he continued to smoke almost daily.  At the time of his arrest, multiple firearms were found accessible within the residence that Honeycutt shared with three young children.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.  "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation.  I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be

deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest.  *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Honeycutt's actions and words clearly demonstrate the need for specific deterrence.  As described above, Honeycutt openly celebrated on social media in real time the violence and destruction he saw on January 6.  After climbing into a sensitive area of the Capitol Building, likely through a broken window, and observing property damage in a Senate office, Honeycutt gleefully exclaimed "Well, made it in" before grinning broadly and sticking out his tongue.

Even after exiting the Capitol Building through a broken window, Honeycutt continued to assist in the mayhem of that day.  With a grin on his face, he helped other rioters who were battling the police by passing a large wooden beam in the direction of the Tunnel.

While Honeycutt removed some incriminating social media posts several days after the riot, this seems more likely to have been an effort to hide his actions from law enforcement than an acknowledgement of wrongdoing.  Initially, he appeared proud of his participation in the riot, posting pictures of broken property.  Only later, in response to expressions of concern by his friends on Facebook, did he make up the lie that he was at a food truck instead of with the rioters.

Even though Honeycutt was sentenced to 18 months for the firearms charge in Florida, he has not yet received any punishment for his unlawful conduct on January 6.  While the government

may not have learned about his firearms offense had it not been for his participation in the events on January 6, his illegal acts on January 6 are entirely distinct from the acts for which he was previously sentenced and warrant their own period of incarceration.  The Government respectfully request that any sentence of incarceration in this case be served consecutively to his current sentence.

A sentence of incarceration would send the message that Honeycutt's action on that day was not the joke that he apparently believed it to be.  His actions were more than just a bad choice that led the police to discover the drugs and guns in his house.  Rather, his participation in the riot on January 6 was worthy of incarceration in itself.  *Cf. United States v. Sobin*, 56 F.3d 1423, 1430 (D.C. Cir. 1995) (applying U.S.S.G. § 5G1.3(c) and concluding that, "[b]ecause the five sexual offense sentences [imposed by a state court] did not result at all from conduct taken into account [in the instant federal bankruptcy fraud prosecution], the district court properly imposed fully consecutive sentences as 'reasonable incremental punishment' for the instant offenses").

As of the date of this filing, Honeycutt has not expressed remorse.  His lack of remorse underscores the need for specific deterrence in this case. In sum, this Court should impose a sentence of incarceration to insure that Honeycutt is deterred from future criminal conduct.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[3]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the

---

[3] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes.  A probationary sentence should not become the default.[4]  *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration.

---

[4]  Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Honeycutt has pleaded guilty to Count One of the Information, charging him with disorderly and disruptive conduct in Capitol grounds, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor.  18 U.S.C. § 3559.  Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9.  The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, and other aggravating or mitigating factors—help explain the differing recommendations and sentences.

And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement officials.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against police officers, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the exact same balance of aggravating and mitigating factors presented here, the case of Annie Howell provides a substantially similar fact pattern minus certain aggravating factors present in this case. *See United States v. Howell*, No. 21-cr-217 (TFH).  On December 2, 2021, Howell pleaded guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  Both Honeycutt and Howell likely climbed into the Capitol through a broken window into SMCR-2.  Howell came to the Capitol Building alone after viewing the riot unfolding on television.  Like Honeycutt, Howell was present during the fighting on the LWT, posted videos on Facebook and later sought to minimize her involvement in the riot.  Like Honeycutt, Howell spent relatively little time inside the Capitol Building.  However, unlike Honeycutt, Howell had no prior criminal record and did not handle destroyed property or pass items to other rioters who were fighting against the police. At a sentencing hearing on March 2, 2022, Judge Thomas F. Hogan sentenced Howell to 60 days incarceration and 36 months of probation.

The Court also may wish to consider the case of Mariposa Castro.  *See United States v. Mariposa Castro*, No 21-cr-299 (RBW).  Castro pleaded guilty to 40 U.S.C. § 5104(e)(2)(G) on November 21, 2021.  Like Honeycutt, Castro spent time on the LWT watching and filming the

confrontation between rioters and police and then entered SMCR-2 by climbing through the broken window.  She spent relatively little time inside.  During and immediately following the riot she glorified the rioters on social media.  These facts resemble Honeycutt; however, unlike Honeycutt, Castro had no prior criminal record and did not handle destroyed property or pass items to other rioters that could be used as weapons against the police.  At a sentencing hearing Judge Reggie B. Walton sentenced Castro to 45 days in prison, noting the apparent glee with which she observed the attack on the Capitol.

Lasty, the Court may find the case of Frank Scavo to be instructive.  *See United States v. Scavo,* 21-cr-254 (RCL).   On September 8, 2021, Scavo pleaded guilty to 40 U.S.C. § 5104(e)(2)(G).  Like Honeycutt, Scavo recorded video of himself outside the Capitol Building, near other rioters who assaulted the police and eventually breached the East side of the building. Like Honeycutt, who filmed himself saying "Well, made it in," Scavo filmed himself saying "Here we go" and three minutes later was inside the Capitol.  Like Honeycutt, Scavo remained inside the Capitol for a relatively short time (eight minutes) and recorded cellphone video of himself celebrating the breach of the Capitol.  In these ways Scavo's case is similar to Honeycutt, except, again, Scavo lacked significant aggravating factors present here. Unlike Honeycutt, Scavo had no prior criminal record and did not handle destroyed property or pass items to other rioters to be used as weapons against the police.  Scavo also submitted to a voluntary interview before his arrest and cooperated with law enforcement, unlike Honeycutt.  On November 22, 2021, Judge Royce C. Lamberth sentenced Scavo to 60 days incarceration.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing a split sentence); *United States v. Meteer*, 21-cr-630 (CJN) (D.D.C. Apr. 21, 2022) (imposing a split sentence).

### A.  A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.  Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal

sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).  Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[5] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[6] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation."  As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense."  Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence."  18 U.S.C. § 3551(b).

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3).  In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense."  H.R. Rep. 102-405, at 167 (1991).  Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language.  *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report).  In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2.  *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404,

at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless."  *Little*, 2022 WL 768685, at *4.  But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation.  *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam).  In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison.  *Id.* at 808.  In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3)

"[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL

44

768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart

from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.*  Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning.  When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence.  Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3).  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two

46

offenses, at least one of which is a petty offense.  For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough.  *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted).  Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation).  Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

#### 1.  *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement

that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*[7]

## A.  Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time."  18 U.S.C. § 3563(b)(10).  Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[8]

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in the defendant's case given the requested 90-day imprisonment sentence.

**VI.    Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Adam Avery Honeycutt to ninety days incarceration, 36 months' probation, 60 hours of community service and $500 in restitution. Such a sentence protects the community, reflect the seriousness of

---

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

the offense, promotes respect for the law, and deters future crime by imposing restrictions on his

liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:      */s/ Brian Morgan*
BRIAN MORGAN
NY Bar No. 4276804
Trial Attorney
Criminal Division, U.S. Department of Justice
1301 New York Avenue NW
Washington, D.C.  20530
Office: 202-305-3717
Brian.Morgan@usdoj.gov